[Cite as *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.*, 2012-Ohio-1942.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 96978**

---

# WESTGATE FORD TRUCK SALES, INC.

PLAINTIFF-APPELLEE

vs.

# FORD MOTOR COMPANY

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED IN PART, REVERSED IN PART, REMANDED**

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-483526

**BEFORE:** Rocco, J., Stewart, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** May 3, 2012

**ATTORNEYS FOR APPELLANT**

Irene C. Keyse-Walker
Benjamin C. Sasse
Tucker Ellis & West, LLP
1150 Huntington Building
925 Euclid Avenue
Cleveland, OH   44115

Loren L. Alikhan
Brian D. Boyle
Jonathan Hacker
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C.   20006

Randall W. Edwards
Randolph Gaw
O'Melveny & Myers LLP
Two Embarcadero Ctr., 28th Floor
San Francisco, CA 94111

Billy M. Donley
Baker & Hostetler LLP
1000 Louisiana
Suite 2000
Houston, TX   77002

**ATTORNEYS FOR APPELLEE**

James A. Lowe
Dennis P. Mulvihill
Lowe Eklund Wakefield & Mulvihill
610 Skylight Office Tower
1660 West Second Street
Cleveland, OH   44113-1454

Kathleen C. Chavez
Robert M. Foote
Craig S. Mielke
Foote, Meyers, Mielke & Flowers LLC
3 N. Second Street
Suite 300
St. Charles, IL 60174

John A. Corr
Law Offices of John A. Corr, LLC
301 Richard Way
Collegeville, PA   19426

Stephen A. Corr
Thomas E. Mellon, Jr.
Mellon, Webster & Shelly
87 North Broad Street
Doylestown, PA 18901

Dennis Pantazis
Wiggins Childs Quinn & Pantazis
The Kress Building
301 Nineteen Street North
Birmingham, AL 35203

James A. Pikl
Scheef & Stone LLP
2601 Network Blvd.
Suite 102
Frisco, TX 75034

KENNETH A. ROCCO, J.:

{¶1} In this class action brought by plaintiff-appellee Westgate Ford Truck Sales, Inc. ("Westgate") against defendant-appellant Ford Motor Company ("Ford") in which the trial court awarded damages in the amount of $1,984,590,150.00, Ford appeals from the trial court decisions that: (1) granted summary judgment to Westgate on the issue of Ford's liability on Westgate's claim of breach of contract; (2) denied Ford's motion for summary judgment on its defenses that Westgate's claim was barred by both Michigan and Ohio law; (3) permitted Westgate to present evidence to the jury of a method to measure damages, but denied Ford's efforts to introduce mitigating evidence; (4) denied Ford's motion to decertify the class; and (5) awarded prejudgment interest to Westgate. Ford further claims the trial court's actions deprived it of its constitutional rights to due process of law and trial by jury.

{¶2} This court holds that the contract in issue is ambiguous. Further, even if a fact finder resolves the ambiguity in favor of Westgate, we hold that there are significant, additional questions of fact as to whether the parties' subsequent course of conduct modified the contract. Finally, we hold that the trial court abused its discretion in excluding Ford's mitigating evidence at the damages trial. Accordingly, we reverse the trial court's decision and remand for further proceedings consistent with this opinion.

{¶3} Most of the facts underlying this case were previously set forth in Ford's earlier appeal of the trial court's decision to certify a class, *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.,* 8th Dist. No. 86596, 2007-Ohio-4013, ("*Westgate I*"). In order to provide background, the relevant portions of that opinion are set forth as follows:

> The procedural facts are undisputed. The Westgate plaintiffs are Ford medium and heavy truck dealers (Ford Series 600 trucks and higher) aggrieved by Ford Motor Company's Competitive Price Assistance ("CPA") program. [footnote omitted]

> The medium and heavy truck market differs from the retail automobile market because medium and heavy trucks tend to be special order trucks and are infrequently bought from existing inventory. Customers may present a list of specifications to the dealer, and often seek bids from competing dealers to obtain the best price. The CPA program permitted truck dealers to petition Ford for discounts or concessions off the wholesale price of trucks in order to meet prices established by competitors.

> There were two components to the CPA program. Ford made the first component, 'Sales Advantage' CPA, available to all of its truck dealers. * * * . A second component, called 'Appeal Level' CPA [hereinafter "Appeal CPA"] entitled dealers with a demonstrated need to petition Ford for additional concessions on a case-by-case basis. To obtain an appeal level concession, dealers were required to submit pricing information, including desired profit on a vehicle. Ford utilized its own criteria for awarding such concessions, and did so in its sole discretion and without informing other dealers of the amount of the concession.

> * * *

> In October 2002, Westgate filed in the Cuyahoga County Court of Common Pleas the complaint at issue here, * * * raising a breach of contract claim stemming from the CPA. [footnote omitted]

{¶4} Westgate's breach-of-contract claim was based on Paragraph 10 of the Standard Franchise Agreement ("SFA") that Ford had with all of its Medium/Heavy Truck dealers.[1] Paragraph 10 stated:

> Sales of COMPANY PRODUCTS by the Company to the Dealer hereunder will be made in accordance with the prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable HEAVY DUTY TRUCK TERMS OF SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN. Except as otherwise specified in writing by the Company, such prices, charges, discounts and terms of sale shall be those in effect, and delivery to the Dealer shall be deemed to have been made and the order deemed to have been filled on the date of delivery to the carrier or the Dealer, whichever occurs first. The Company has the right at any time and from time to time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sale affecting COMPANY PRODUCTS by issuing a new HEAVY DUTY TRUCK or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN, new price schedules or other notices. In the event the Company shall increase the DEALER PRICE for any COMPANY PRODUCT, the Dealer shall have the right to cancel, by notice to the Company within ten (10) days after receipt by the Dealer of notice of such increase, any orders for such product placed by the Dealer with the Company prior to receipt by the Dealer of notice of such increase and unfilled at the time of receipt by the Company of such notice of cancellation.

{¶5} Westgate argued that Paragraph 10 required Ford to publish to all of its dealers the Appeal CPA discounts that it was providing to individual dealers, and that Ford's failure to publish these prices to all dealers constituted a breach of contract. The trial court granted Westgate's motion for class certification and certified as a class "[a]ll

---

[1]Although Westgate attached a copy of the SFA to its complaint as required by Civ.R. 10, the page that contains paragraph 10 is missing from the record on appeal. The language of that paragraph as set forth in this opinion, therefore, is

franchised Ford Dealers operating in the United States who purchased from Ford any truck of series 600 and above (*Medium/Heavy Truck*) in the time period commencing on October 5, 1987 to the present."

{¶6} In *Westgate I*, Ford challenged the class certification on several grounds. At that time, this court affirmed the trial court's decision to certify the class, noting that the decision to continue class certification could change as the litigation unfolded. The case returned to the trial court for further proceedings.

{¶7} Thereafter, Ford filed eight separate motions for summary judgment; Westgate filed two. The trial court granted summary judgment to Westgate on its breach-of-contract claim and denied all of Ford's motions. The court determined that the proper measure of damages was for a jury to decide.

{¶8} The jury awarded Westgate $4.5 million. Ford's motions for a directed verdict, for judgment notwithstanding the verdict, for a new trial, and to decertify the class all proved unsuccessful. The trial court entered judgment for Westgate on the jury's verdict and awarded Westgate prejudgment interest in the amount of $6,654,157.00.

{¶9} As to the class members' damages, the trial court adopted the methodology utilized by Westgate's expert witnesses. The trial court entered judgment in the amount of $780,616,018.00 for all class members that had been represented by Westgate against

quoted from *Westgate I*.

Ford, plus class-wide prejudgment interest in the amount of $1,192,819,975.00. The entire damage award against Ford amounted to $1,984,590,150.00.

{¶10} Ford filed its notice of appeal from the trial court's entry of final judgment, and presents six assignments of error for review.

**"I.   The trial court erred when it granted Westgate's Motion for Partial Summary Judgment on classwide liability and denied Ford's Motions for Summary Judgment based on the terms of the contract, waiver and estoppel, and failure to provide notice.**

**"II.   The trial court erred when it denied Ford's Motion for Summary Judgment based on the applicable statute of limitations.**

**"III.   The trial court erred and abused its discretion in rulings before and during the trial on 'Westgate's damages only,' and in denying Ford's motions for directed verdict, judgment notwithstanding the verdict, and for a new trial.**

**"IV.   The trial court erred and abused its discretion when it denied Ford's Motion to Decertify the Class.**

**"V.   The trial court erred in its award of prejudgment interest.**

**"VI.   The trial court deprived Ford of its rights to due process and a trial by jury."**

{¶11} We sustain Ford's first and third assignments of error. We overrule Ford's second assignment of error. We decline judgment on Ford's fourth, fifth, and sixth assignment of error as they are now moot.

**{¶12}** Ford argues in its first assignment of error that the trial court erred in granting summary judgment for Westgate on its claim that Ford breached the terms of the SFA. Ford contends that Paragraph 10 of the SFA was ambiguous. Alternatively, Ford argues that, even if the contract terms were unambiguous, Ford was entitled to a jury determination on the merits of its affirmative defenses of waiver, estoppel, and failure to provide notice. We agree that the trial court erred in granting summary judgment to Westgate on the issue of liability.

**{¶13}** Appellate review of summary judgment is de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Pursuant to Civ.R. 56(C),[2] summary judgment is appropriate when:

> (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Grafton* at 105.

**{¶14}** According to Michigan law, the court's primary obligation in interpreting a contract is to determine the intent of the contracting parties. *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251 (2003). "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas.*

---

[2]The parties agree that Michigan law controls in the interpretation of the substantive terms of the contract. The parties further agree that, because the action was filed in Ohio, Ohio law governs the procedure to be applied. Thus, the trial court and the parties were required to follow the Ohio Rules of Civil Procedure.

*Co. v. Old Republic Ins. Co.*, 466 Mich. 142, 146, 644 N.W.2d 715 (2002).   A contract is construed as a matter of law   "if the language * * * is clear and unambiguous."   *Quality Prod. & Concepts Co.* at 375.   Conversely, "the meaning of an ambiguous contract is a question of fact that must be decided by the jury."   *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 469, 663 N.W.2d 447 (2003).   Ambiguity exists when the provision is "capable of conflicting interpretations."   *Id.* at 467.

**{¶15}** In this case, the SFAs Ford made with its medium/heavy truck dealers were standardized; each one contained the same language and set forth the same definitions. The trial court found that Paragraph 10 unambiguously required Ford to publish to all dealers the price that it sold to any dealer (including any Appeal CPA discount) on a particular sale.   We disagree and conclude that Paragraph 10 is susceptible to more than one interpretation, and is, therefore, ambiguous.

**{¶16}** To be sure, there are a number of terms in Paragraph 10 that are unambiguous, but when viewed as a whole, Paragraph 10 is ambiguous and   requires resolution by a fact finder.   Paragraph 10 requires that:

> Sales of COMPANY PRODUCTS by the Company to the Dealer hereunder will be made in accordance with the prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable TRUCK   TERMS OF SALE BULLETIN.

**{¶17}** Ford argues that the term "Dealer" refers only to the specific party to that particular SFA, e.g., Westgate. We agree. Page one of the SFA sets forth that the SFA is between Ford and Westgate Ford Truck Sales, "hereinafter called the 'Dealer'." In contrast, in the definitions section of the SFA, "Authorized Ford Truck Dealer" is defined as "any person, firm or corporation having a valid and existing Ford Sales and Service Agreement or Ford Truck Sales and Service Agreement from the Company." SFA at ¶ 1(d). It follows that, had Ford wanted to specify in Paragraph 10 that its duty was to publish to all dealers, it would have used the defined term "Authorized Ford Truck Dealer" rather than the defined term "Dealer." Accordingly, where the SFA references the "Dealer" it is referring to only one dealer: the dealer that had signed that particular SFA. Accordingly, Ford's publication obligation, set forth in Paragraph 10, ran only to whichever dealership signed that SFA.

**{¶18}** The term "TRUCK TERMS OF SALE BULLETIN" is defined in the SFA as "the latest TRUCK TERMS OF SALE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company setting forth the terms of sale and ordering procedures applicable to sales of TRUCK to Authorized Ford Truck dealers." Agreement at ¶ 1(g). This definition unambiguously sets forth that the "TRUCK TERMS OF SALE BULLETIN" is a uniform document applicable to all "Authorized Ford Truck dealers," not just to the specific Dealer who is a party to a particular SFA.

**{¶19}** While the terms "Dealer" and "TRUCK TERMS OF SALE BULLETIN" are unambiguous, we conclude that Paragraph 10 is ambiguous because it is unclear exactly

what Ford was required to publish to any particular dealer. Specifically, it is unclear what Paragraph 10 means when it refers to "other notices" and in its requirement that publication is made "in accordance with" the TRUCK TERMS OF SALE BULLETIN.

{¶20} Westgate argues that in order for a publication to be "in accordance with" the "TRUCK TERMS OF SALE BULLETIN," the publication given to all dealers must necessarily include prices, including any Appeal CPA discount price given to an individual dealer. In making this argument, Westgate points to language in paragraph 10 providing that:

> Sales of Company Products by the Company to the Dealer hereunder will be made in accordance with the prices, charges discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable TRUCK TERMS OF SALE BULLETIN.

According to Westgate, this language dictates that price is necessarily "a term of sale," and that all prices offered to one dealer must be published to all dealers.

{¶21} In contrast, Ford argues that the TRUCK TERMS OF SALE BULLETIN is a background provision and that an "other notice" (which, according to Ford, includes an Appeal CPA discount) must be published "in accordance with" the TRUCK TERMS OF SALE BULLETIN. Ford provides the following example of how this might work:

> [I]f the applicable terms of sale bulletin required Authorized Ford Dealers to make payment on confirmed sales within 10 business days, or required a 10% deposit on heavy truck orders, Paragraph 10 then instructs that any pricing notices delivered to the given Dealer be considered qualified by these requirements. Ford Br. at 18.

**{¶22}** Ford and Westgate both present reasonable arguments as to what Paragraph 10 required Ford to publish to Westgate and to its other dealers. Because Paragraph 10 is susceptible to more than one interpretation, we hold that it is ambiguous. Accordingly, the trial court erred in granting summary judgment to Westgate on the issue of liability.[3]

**{¶23}** Furthermore, even if a fact finder determines that Paragraph 10 required Ford to publish all Appeal CPA discounts to every dealer, a fact finder must also determine whether the SFA was modified by waiver, estoppel and/or by the dealers' failure to provide notice that they did not agree with the CPA program. Ford argues that even if Paragraph 10 required Ford to publish all Appeal CPA prices, Westgate waived strict performance by consistently availing itself of the Appeal CPA discounts.

**{¶24}** Although the SFA contained a clause requiring modifications be made in writing, the Michigan Supreme Court has held that, even where such a clause exists, a contract can be modified through course of dealing when there is clear and convincing evidence of the parties' mutual intent to modify the contract. *Quality Prods. & Concepts Co.*, 469 Mich. at 364-365, 666 N.W.2d 251.

**{¶25}** Although "[m]ere knowing silence generally cannot constitute waiver," *id.* at 365, in the instant case there is ample evidence indicating that Westgate regularly

---

[3]We note that we are not the first court to find the SFA in issue to be ambiguous. *See Bayshore Ford Truck Sales Inc. v. Ford Motor Co.*, 380 F.3d 1331, 1335-36 (11th Cir. 2004) (holding that summary judgment was not warranted because paragraph 10 was susceptible to conflicting interpretations).

participated in the Appeal CPA program and that Westgate derived a benefit from its participation. Importantly, it was Westgate, not Ford, that had to initiate the process of seeking Appeal CPA pricing. With apologies to the Bard, we must ask whether Paragraph 10 has been "more honor[e]d in the breach than the observance."[4] Accordingly, it is for the fact finder to weigh the evidence and determine whether the parties' course of conduct presents clear and convincing evidence of an intent to modify the contract. The trial court erred in deciding otherwise.

{¶26} Ford's first assignment of error is sustained. We conclude that a fact finder must interpret Paragraph 10's meaning in the SFA. If the fact finder resolves the ambiguity in favor of Westgate, the trial court shall instruct the fact finder to determine whether the parties' course of conduct constituted clear and convincing evidence that Westgate waived strict performance.

{¶27} We next turn to the second assignment of error: whether the trial court erred in denying Ford's motion for summary judgment based on the statute of limitations. Ford argues that the trial court should have applied Ohio's four-year statute of limitations that applies where the UCC governs the contract. While Ford had made other statute of limitations arguments to the trial court, we conclude that Ford never adequately developed this statute-of-limitations theory to the court below, and so Ford has waived

---

[4] Shakespeare, *Hamlet*, Act I, Scene iv, line 18.

this argument on appeal. *See Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). Accordingly, Ford's second assignment of error is overruled.

**{¶28}** In its third assignment of error Ford argues that the trial court abused its discretion in a series of rulings that allowed Westgate to present its damages model to the jury while excluding Ford's rebuttal evidence. We conclude that the trial court did not abuse its discretion in admitting Westgate's expert testimony. However, we agree with Ford that the trial court did abuse its discretion in excluding Ford's rebuttal evidence.

**{¶29}** We review trial court decisions to admit or exclude evidence for abuse of discretion. *Krischbaum v. Dillon,* 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991). An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶30}** Ford contends that the evidence Westgate presented was inadmissible because it lacked an evidentiary basis and it failed to satisfy Evid.R. 702(C). Under Evid.R. 702(C) an expert witness's testimony must be "based on reliable, scientific, technical or other specialized information." Whether an expert's opinion is admissible depends on whether the principles and methods employed by the witness to reach his opinion were reliable and not on whether his conclusions are correct. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 687 N.E.2d 735 (1998).

**{¶31}** Ford asserts that Westgate's experts used a flawed methodology in calculating damages. Westgate's model is premised on the assumption that, had Ford

complied with Paragraph 10's requirement to publish all Appeal CPA discounts to all dealers, Ford could not have conducted the Appeal CPA program in any way, shape, or form. Instead, Westgate's model envisions a breach-free world where all trucks would have received uniform, across-the-board discounts equaling the average Appeal CPA discount. Ford's position is that this methodology is groundless because there is no evidence supporting the contention that Ford would have conducted its business in such a manner.

{¶32} We conclude that the trial court did not abuse its discretion in allowing Westgate's experts to introduce this methodology to the jury. Assuming arguendo that failing to publish Appeal CPA prices to all dealers was a breach of the SFA, a fact question remains as to how Ford would have priced trucks if not for the breach. We cannot say that it was an abuse of discretion to allow Westgate to present the theory that the CPA Appeal program could not exist whatsoever if not for the breach.

{¶33} On the other hand, it was an abuse of discretion to exclude Ford's rebuttal evidence, which supported Ford's position that it would not have completely eliminated its Appeal CPA program had it been required to publish Appeal CPA prices to all of its dealers. The trial court excluded this evidence on the theory that the evidence went to the question of liability as opposed to damages. We disagree. Just as Westgate was entitled to present its theory that the Appeal CPA program would have been completely eliminated, so was Ford entitled to present evidence that went to whether existing market factors would have made it economically unfeasible for Ford to actually offer the types of

discounts contemplated by Westgate's model. Ford was also entitled to present evidence that went to whether Ford could have and would have continued the Appeal CPA pricing even while publishing the discounts it was offering to its various dealers.

{¶34} The model presented by Westgate assumed that Ford would have completely eliminated its Appeal CPA program if not for its breach. Westgate's entire damages calculation was based on this assumption. Whether or not this assumption stood up to real-world market forces is entirely relevant to the question of damages, and it was unreasonable for the trial court to exclude this evidence from the jury's consideration. Accordingly, the trial court erred in excluding such evidence. Specifically, we conclude that excluding the following evidence was an abuse of discretion:

1. The testimony of former CPA manager, John Fink, about a study previously commissioned by Ford regarding the possible abolition of the Appeal CPA program with the replacement of fixed price discounts to dealers;

2. The testimony of John Fink and Tom Beule (Westgate's owner) about the eligibility criteria for an Appeal CPA discount, including the fact that discounts were passed through to the customer;

3. The testimony of Ford's expert regarding the financial impact the type of across-the-board discount contemplated by Westgate's theory would have had on Ford;

4. The testimony and exhibits showing that Ford had lost hundreds of millions of dollars during the class period in selling its medium and heavy trucks;

5.  The testimony from Ford's expert explaining why the profit margins for dealers under Westgate's model would be economically unfeasible;

6.  Dr. House's testimony that no other truck manufacturer had limited itself to offering a fixed percentage discount akin to Westgate's assumption of discounts equaling the average Appeal CPA discount;

7.  John Fink's testimony that Ford set its wholesale prices and discounts by tracking and reviewing the prices and discounts for comparable trucks offered by competitors; and

8.  The testimony from Westgate's general sales manager that the Appeal CPA program benefitted Westgate by helping it sell more trucks.

{¶35} Ford was entitled to demonstrate to the jury that, even if Ford had published all discounted prices to all dealers, economic conditions would have required Ford to find an alternative method of offering discounts only on a case-by-case basis.  In other words, Ford was entitled to show that offering all dealers across-the-board discounts on every truck it sold would have been economically infeasible and that Ford could have continued some form of the Appeal CPA program.  Accordingly, the trial court abused its discretion when it prevented Ford from presenting the aforementioned evidence to the jury, and Ford's third assignment of error is sustained.

{¶36} In its fourth assignment of error, Ford asserts that the trial court abused its discretion by denying Ford's motion to decertify the class.  In light of our decision that Ford's evidence was improperly excluded, we decline to rule on this assignment of error at this time.  On remand, the trial court is instructed to admit the previously excluded

evidence. After this evidence is admitted, we question whether the trial court would be able to continue to certify the class at the damages phase (assuming first that the fact finder finds in favor of Westgate). Once the trial court admits the previously excluded evidence, it will need to determine whether it can continue to certify the class.

{¶37} In its fifth assignment of error, Ford argues that the trial court improperly applied R.C. 1343.03(A) in awarding prejudgment interest. Because we are reversing and remanding for a new trial, we decline to address this assignment of error as it is now moot.

{¶38} Ford argues in its sixth assignment of error that the trial court's actions, i.e., in granting summary judgment to Westgate on the issue of liability, in evidentiary rulings, and in entering judgment against Ford in this class action, deprived Ford of its constitutional rights to due process and trial by jury. We similarly decline to address this assignment of error as it is now moot.

{¶39} The trial court's orders are affirmed in part, reversed in part, and remanded.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, JUDGE

MELODY J. STEWART, P.J., CONCURS;
LARRY A. JONES, SR., J., DISSENTS IN PART AND
CONCURS IN PART (SEE ATTACHED OPINION)

LARRY A. JONES, SR., J., DISSENTING IN PART AND CONCURRING IN PART:

{¶40} I dissent in part and concur in part.   I would affirm the trial court's decision to grant summary judgment to Westgate on the issue of liability but agree with the majority's disposition of the third assignment of error and find that the trial court abused its discretion in excluding Ford's rebuttal evidence at trial.

{¶41} I would find that the contract between Ford and Westgate was unambiguous and Ford's operation of the CPA program breached Paragraph 10 of its franchise agreements.   As the majority notes, the terms of the contract as to each dealer were standardized; each contract contained the same language and set forth the same definitions.   Paragraph 10 specifically stated that Ford would sell products to the dealer at "prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable Truck Terms of Sale Bulletin or Parts and Accessories Terms of Sale Bulletin."   Paragraph 1(g) stated that Truck Terms of Sale Bulletins must set forth the "terms of sale and ordering procedures applicable to sales of Truck[s] made to Authorized Ford truck dealers."   And paragraph 1(d) defined "Authorized Ford truck dealers" as "any person, firm or corporation having a valid and existing [SFA]."

**{¶42}** I would find that Paragraph 10 unambiguously imposed a duty on Ford to sell trucks to each individual dealer at published prices and discounts "applicable to sales of trucks made" to "any person, firm, or corporation having a valid and existing" SFA. Contrary to Ford's argument, the company was not required to publish CPA appeal prices after a sale had been made; rather, the company was required to publish wholesale prices and discounts *and* sell trucks to individual dealers at those prices and discounts that had been published *in advance* to *all* dealers.

**{¶43}** Westgate set forth uncontroverted evidence that the effect of the CPA program nullified the dealers' right, pursuant to their contracts, to purchase trucks at published prices and instead replaced that right with a program that allowed Ford to sell a truck to a dealer at whatever price a pricing manager deemed appropriate. In other words, the CPA program allowed Ford to control dealer profits and shift retail revenue from the dealers to Ford by manipulating wholesale pricing on a case-by-case basis.

**{¶44}** I also would not find that the dealers' alleged acquiescence and use of the CPA program somehow modified the terms of the contract. Ford required its dealers to follow the CPA program — essentially, if an individual dealer wanted to keep its franchise, the dealer had to follow the program. Thus, the dealers' use of the CPA program when purchasing trucks cannot be deemed voluntary when there was no alternative method of purchasing available.

**{¶45}** Therefore, I would affirm the trial court's decision to grant Westgate's motion for summary judgment on the issue of liability.

{¶**46**} I concur with the majority that the trial court abused its discretion in not allowing Ford to present its rebuttal evidence as to the issue of damages. As the majority notes, Westgate's damages model was premised on the assumption that Ford would have eliminated its CPA program if Ford had published the wholesale prices to its dealers. Ford's witnesses would have attempted to refute this claim and any such evidence went directly to the issue of damages. Consequently, the trial court's decision to exclude this evidence was in error and an abuse of its discretion. Therefore, I agree that a new trial should be ordered on damages.

#96978